No. 88-410

IN THE SUPREME COURT OF THE STATE OF MONTANA

1989

RUSSELL E. MEECH,

            Plaintiff,

    -vs-

HILLHAVEN WEST, INC., and  R. RON
SEMINGSON,

            Defendants.


ORIGINAL PROCEEDING:

COUNSEL OF RECORD:

    For Plaintiff:

        Best Law Offices; Michael Best argued, Great Falls, Montana

    For Respondent:

        James, Gray & McCafferty; Robert F. James, Great Falls,
        Montana
        Jackson, Lewis, Schnitzler and Krupman;
        Joel P. Kelly argued, and Elizabeth Platte Johnson on
        the brief, Los Angeles, California

    For Amicus Curiae:

        Church, Harris, Johnson & Williams; Cresap S. McCracken,
        Great Falls, Montana
        Patrick W. Shea; Paul, Hastings, Janofsky & Walker,
        Washington, D.C.

FILED

JUN 2 0 1989

Filed: *Ed Smith*
CLERK OF SUPREME COURT
STATE OF MONTANA

Clerk

Submitted: April 11, 1989
  Decided: June 29, 1989

Mr. Justice R. C. McDonough delivered the Opinion of the Court.

This opinion concerns questions certified to this Court by the United States District Court for the District of Montana, Great Falls Division, Honorable Paul G. Hatfield presiding. The questions are as follows:

(1) Is the Montana Wrongful Discharge From Employment Act, §§ 39-2-901 to -914, MCA, unconstitutional in that it serves to wrongfully deprive an individual falling within the purview of the Act from his or her right to "full legal redress" within the meaning of Article II, § 16 of the Montana Constitution?

(2) Are those provisions of the Montana Wrongful Discharge From Employment Act which expressly prohibit recovery of noneconomic damages, and limit the recovery of punitive damages, violative of an individual's right to "full legal redress" within the meaning of Article II, § 16 of the Montana Constitution?

We answer "No" to both questions.

Petitioner Meech's action in the United States District Court claims damages for wrongful termination from employment, breach of the implied covenant of good faith and fair dealing, and intentional or negligent infliction of emotional distress. Meech also seeks punitive damages for allegedly oppressive, malicious, and unjustifiable conduct on the part of Meech's former employer, respondent Hillhaven. The claims grew from the alleged wrongful discharge of Meech by Hillhaven. Hillhaven moved to dismiss asserting that the Montana Wrongful Discharge From Employment Act (Act) precluded Meech's common-law claims. Meech responded to the motion by contending that the Act violated Article II, § 16 of the Montana Constitution. Certification of the questions

2

presented here followed. Before fully answering the questions, a brief summary of the Act aids in understanding the issues.

The Act provides the exclusive remedy and procedure for actions formerly governed to a great extent by common-law requirements:

> Preemption of common-law remedies: Except as provided in this part, no claim for discharge may arise from tort or express or implied contract.

Section 39-2-913, MCA. The Act exempts from its provisions causes of action for discharge governed by other state or federal statutory procedures for contesting discharge disputes. For example, the Act exempts from its provisions, discriminatory discharges, and actions for wrongful discharge from employment covered by written collective bargaining agreements or controlled by a written contract for a specific term. For other wrongful discharge claims, however, the Act provides the exclusive procedure. Sections 39-2-912 to -913, MCA. The Act repeals Montana statutes which formerly granted to both employees and employers the right to terminate the employment relationship for fault on the part of the other party. Sections 39-2-504 to -505, MCA (1985). The Act's provisions on discharge also limit the operation of § 39-2-503, MCA, Montana's "at-will" statute. See § 39-2-902, MCA. In place of the prior governing statutes and the common-law causes of action it abrogates, the Act provides a statutorily defined cause of action for wrongful discharge.

The Act broadly defines "discharge" to include constructive discharge. Section 39-2-903, MCA. Covered employees may sue for discharges defined as wrongful under the Act. Section 39-2-904, MCA. Three causes of action for "wrongful" discharge exist under the Act: discharge in

3

retaliation for an employee's refusal to violate public policy or for reporting a violation of public policy, discharge in violation of the express provisions of the employer's written personnel policies, and discharge for reasons other than good cause as defined in the Act. The Act limits the time for bringing a cause under its provisions to one year from the date of discharge. Section 39-2-904, MCA.

The Act establishes the extent of employers' liability for wrongful discharge. Under the Act, plaintiffs have no claim to damages for "pain and suffering, emotional distress, compensatory damages, or punitive damages, or any form of damages, except as provided for in subsections (1) and (2) [of § 39-2-905, MCA]." Subsections (1) and (2) of § 39-2-905, MCA, provide damages for lost wages and fringe benefits, together with interest thereon for a period not to exceed four years from the date of discharge. The Act defines the value of employee paid pension plans, insurance coverage, vacation time, and sick time as fringe benefits. Subsection (2) provides for an award of punitive damages where claimants can show by clear and convincing evidence actual malice or actual fraud. Interim earnings, including those the claimant could have earned with reasonable diligence, are to be subtracted from the award for lost wages. Section 39-2-905(1), MCA. The Act also provides an incentive for arbitration as an alternative mechanism for settling employment disputes. Section 39-2-913, MCA.

Meech in essence argues that the Act denies his fundamental right to full legal redress under Article II, § 16 of the Montana Constitution. Meech also contends that the Act violates equal protection by denying the fundamental right to full legal redress to a class of claimants without demonstrating that the classification furthers a compelling state interest. See Corrigan v. Janey (Mont. 1981), 626 P.2d

4

838, 38 St.Rep. 545; White v. State (1983), 203 Mont. 363, 661 P.2d 1272; Pfost v. State (1986), 219 Mont. 206, 713 P.2d 495. Hillhaven answers that the Act does not violate equal protection of the laws or infringe on a fundamental right to full legal redress because Article II, § 16 of the Montana Constitution guarantees only a right of access to courts to seek a remedy for wrongs recognized by common-law or statutory authority, and the legislature may alter common-law causes of action to promote a legitimate state interest. See Shea v. North Butte Mining Co. (1919), 55 Mont. 522, 179 P. 499; Stewart v. Standard Publishing Co. (1936), 102 Mont. 43, 55 P.2d 694; Reeves v. Ille Electric Co. (1976), 170 Mont. 104, 551 P.2d 647. We agree with Hillhaven and overrule Corrigan, White, and Pfost insofar as they hold that Article II, § 16 of the Montana Constitution guarantees a fundamental right to full legal redress.

I.

THE ACT DOES NOT VIOLATE THE FUNDAMENTAL RIGHT OF FULL LEGAL REDRESS, BECAUSE NO SUCH "FUNDAMENTAL RIGHT" IS CREATED BY ARTICLE II, SECTION 16.

Summarized, this section covers the following points:

A. The conclusion that Article II, § 16 of the Montana Constitution does not create a fundamental right results from examination of long-standing, fundamental principles of constitutional interpretation.

B. The basic rule that the legislature may alter the common law harmonizes with an interpretation of Article II, § 16, as only a mandate to the courts.

C. It also follows from the words of the original guarantee, and the meaning intended for the 1972 amendment to the original guarantee, that Article II, § 16, does not

5

guarantee a fundamental right to a particular cause of action, remedy, or redress.

D. Judicial creation of such a fundamental right in this context would also violate the elemental principle of separation of powers.

E. Meech's arguments on these points are inapposite.

A. <u>Historically, Courts Have Construed Constitutional Guarantees in Light of the Particular Abuses Those Guarantees Seek to Prevent.</u>

In construing a constitutional guarantee, courts "have looked to the object and purpose to be accomplished by the provision." C. J. Antieau, Constitutional Construction § 3.05 (1982). A "'very useful key to the construction [of] a constitutional guarantee is to inquire what was the evil to be removed, and what remedy did the new instrument propose; . . . .'" C. J. Antieau, Constitutional Construction § 3.05 (1982)(quoting Miller, Lectures on Constitutional Law 82 (1891)).

Construing our speedy remedy guarantee in light of the particular abuses the framers sought to correct supports the argument that the clause does not guarantee a fundamental right to "full legal redress." The predecessor to Article II, § 16, was Article III, § 6 of the 1889 Montana Constitution, which reads as follows:

> Courts of justice shall be open to every person, and a speedy remedy afforded for every injury of person, property, or character; and that right and justice shall be administered without sale, denial, or delay.

The principal cases Hillhaven relies on, <u>Shea</u>, <u>Stewart</u>, and <u>Reeves</u>, concluded that Article III, § 6 of the 1889

6

Constitution did not constrict legislative powers because the article only provided a mandate to the courts to provide equal access to causes of action recognized at law. Shea, 179 P. at 502; Stewart, 55 P.2d at 696; Reeves, 551 P.2d at 651; cf. State ex rel. Carlin v. District Court (1945), 118 Mont. 127, 164 P.2d 155 (trial court's failure to convene jury for case long awaiting jury trial because of inconvenience to jurors violates the mandate in Montana's remedy guarantee requiring that courts provide a proper administration of justice); Tooke v. Miles City Production Credit Association (Mont. 1988), 763 P.2d 1111, 45 St.Rep. 1993 (fact that United States District Courts for the District of Montana deny federal subject matter jurisdiction of tort claims against production credit unions weighs for finding subject matter jurisdiction in Montana District Courts because Montana's remedy guarantee mandates a forum for claims cognizable according to applicable law).

Legal history demonstrates that Shea and Stewart reached the correct conclusion. Article III, § 6, was not placed in the Constitution as a directive to the legislature. Rather, the guarantee was directed at the courts, and it was framed to provide for equality in the administration of justice. Prior to the decisions in Shea and Stewart, this Court traced the guarantee embodied in Article III, § 6, to Chapter 40 of the Magna Carta. Stephens v. Nacey (1913), 47 Mont. 479, 482-83, 133 P. 361, 362. The Magna Carta's chapter 40, which contains language similar to the last segment of Article III, § 6, reads as follows:

> To no one will We sell, to none will We deny or delay, right or justice.

A. E. Howard, Magna Carta: Text and Commentary 43 (1964). The language of the first part of Article III, § 6, providing for a speedy remedy for injury to person, property, and character, resembles commentary on Chapter 40 by the influential 17th century expositor on the common law, Sir Edward Coke:

> "And therefore every Subject of this Realm, for injury done to him in _bonis_, _terris_, _vel persona_ [i.e., goods, lands, or person], by any other Subject, be he Ecclesiastical, or Temporal, Free or Bond, Man or Woman, Old or Young, or be he outlawed, excommunicated, or any other without exception, may take his remedy by the course of the Law, and have justice and right for the injury done him, freely without sale, fully without any denial, and speedily without delay."

Shuman, _Oregon's Remedy Guarantee_, 65 Or. L. Rev. 35, 39 (1986) (quoting E. Coke, Second Institute 55-56 (4th ed. 1671)). Coke's version of Chapter 40 influenced the content of remedy clauses in many state constitutions:

> The constitutions of thirty-seven states contain passages which, in substance, provide that the courts "shall be open to every person, and speedy and certain remedy afforded for every wrong and for every injury to person, property, or reputation." .
> . . [I]t appears most likely that the highly influential Sir Edward Coke, commenting on the Magna Carta more than four centuries after its adoption, was primarily responsible for the contemporary forms of the various certain-remedy provisions.

Note, _Constitutional Guarantees of a Certain Remedy_, 49 Iowa L. Rev. 1202, 1202-03 (1964).

Coke's interpretation of the Magna Carta is, in a broad sense, faithful to its origins. The English feudal nobility sought through Chapter 40 to eliminate abuses in the writ

system which governed King's courts. The abuses in the system made the price of the writ obtained by a would-be litigant a determinant of the quality of justice received. See generally W. McKechnie, The Magna Carta: A Commentary on the Great Charter of King John (2d ed. 1914). The goal of ending the abuses present in the English writ system eventually lead to the embodiment of a greater constitutional principle:

> It is evident that the Magna Carta did not put down the practice of charging heavy fees for writs. Yet this chapter [Chapter 40], although so frequently misunderstood and exaggerated, is still of considerable importance. . . . [I]t has been interpreted as a universal guarantee of impartial justice to high and low; and because, when so interpreted, it has become in the hands of patriots in many ages a powerful weapon in the cause of constitutional freedom.

W. McKechnie, The Magna Carta: A Commentary on the Great Charter of King John 397-98 (2d ed. 1914).

The recognition of the historical meaning of guarantees derived from Chapter 40 as mandating that the courts provide equal access to justice, led to limited interpretations of remedy clauses when plaintiffs claimed the provisions constricted the legislature. Wheeler v. Green (Ore. 1979), 593 P.2d 777, 789 (citing Davidson v. Rogers (Ore. 1978) (Linde, J. concurring) 574 P.2d 624); Goldberg v. Musim (Colo. 1967), 427 P.2d 698; Shoemaker v. Mountain States Telephone and Telegraph Co. (Colo. App. 1976), 559 P.2d 721; Twin Falls Clinic & Hospital Bldg. Corp. v. Hamill (Id. 1982), 644 P.2d 341; Harrison v. Schrader (Tenn. 1978), 569 S.W.2d 822. The concurring opinion in Davidson by Justice Linde set out the rationale for a limited interpretation of the guarantees in remedy clauses as follows:

> The guarantee in article I, section 10, of a "remedy by due course of law for injury done [one] in his person, property, or reputation" is part of a section dealing with the administration of justice. It is a plaintiffs' clause, addressed to securing the right to set the machinery of the law in motion to recover for harm already done to <u>one of the stated kinds of interest</u>, a guarantee that dates by way of the original state constitutions of 1776 back to King John's promise in Magna Charta chapter 40: . . . It is concerned with securing a remedy from those who administer the law, through courts or otherwise.

<u>Davidson</u>, 574 P.2d at 625-26 (Linde J., concurring) (emphasis added). Put another way:

> The guarantee tells those who <u>apply</u> the law when and how they must do so. It says nothing to <u>lawmakers</u>, except insofar as they attempt to <u>interfere</u> with the administration of justice.

Schuman, <u>Oregon's Remedy Guarantee</u>, 65 Or. L. Rev. 35, 67 (1986) (emphasis in original).

In <u>Shea</u>, this Court succinctly explained this point holding that Article III, § 6, did not constrict the legislature's power to replace common-law personal injury actions with actions provided by workers' compensation legislation:

> A reading of the section discloses that it is addressed exclusively to the courts. The courts are its sole subject-matter, and it relates directly to the duties of the judicial department of the government. <u>It means no more nor less than that, under the provisions of the Constitution and laws constituting them, the courts must be accessible to all persons alike, without discrimination, at the time or times and the place or places for their sitting, and afford a speedy</u>

remedy for every wrong recognized by law as being
remedial.

Shea, 179 P. at 502 (emphasis added). Both Stewart and
Reeves quoted Shea for the proposition that the remedy
guarantee, as a mandate aimed exclusively at the courts, does
not constrict legislative powers.

We agree with Shea, Stewart, and Reeves on this point.
The history of the guarantee indicates that framers of state
constitutions inserted remedy clauses to insure equal
administration of justice. Clauses insuring equal
administration of justice are aimed at the judiciary, not the
legislature. Therefore, the history of our provision
supports Hillhaven's argument that our remedy guarantee does
not create a fundamental right to full legal redress. Such a
reading of the remedy guarantee also accords with another
rule recognized in Shea: No one has a vested right to any
rule of common law.

B.    No One Has a Vested Right to a Rule of Common Law.

The controversy posed by the first question from the
United States District Court hinges also on whether Article
II, § 16, prohibits the legislature from exercising its
plenary power to abrogate the common-law tort causes of
action alleged by Meech. The general rule on the
constitutional authority of state legislatures is that:

> [T]he people, through the legislature, have plenary
> power, except in so far as inhibited by the
> Constitution, and the person who denies the
> authority in any given instance must be able to
> point out distinctly the particular provision of
> the Constitution which limits or prohibits the
> power exercised.

11

Missouri River Power Co. v. Steele (1905), 32 Mont. 433, 438-39, 80 P. 1093, 1094. The general rule is also that no one has a vested interest in any rule of common law. Therefore, as a general proposition, the legislature, under its plenary power to act for the general welfare, may alter common-law causes of action. The legislative action may not, however, infringe on constitutional rights. We have already pointed out that historically, Article II, § 16, does not constrict the power of the legislature to alter common-law causes of action. The more specific issue here is whether the legislature may alter or abrogate causes of action sounding in tort.

A tort may be defined as:

> [A] civil wrong, other than breach of contract, for which the court will provide a remedy in the form of an action for damages. This, of course, says nothing more than that a tort is one kind of legal wrong, for which the law will give a particular redress. . . .

> When it becomes clear that the plaintiff's interests are entitled to legal protection against the conduct of the defendant, the mere fact that the claim is novel will not of itself operate as a bar to the remedy.

> At the opposite extreme is the bold attempt to reduce the entire law of torts to a single broad principle, that any harm done to another is a wrong, and calls for redress, unless "justification" for it can be shown. . . . [T]he rule does not tell us what the law will recognize as "harm" to another, or as "justification" for it. There are many interferences with the plaintiff's interests, including many instances of negligently causing mere mental suffering without physical consequences or depriving the plaintiff of the benefit of a contract, for which the law will give no remedy, although the defendant has been clearly at fault. . . . It is legal justification which

12

must be looked to: the law will hold the defendant responsible for what the law regards as unjustified---and so stated, the broad rule [remedy for every wrong] means little, or nothing.

W. L. Prosser, W. P. Keeton, Prosser and Keeton on Torts § 1, at 2-4 (5th ed. 1984)(emphasis in original). Prosser also explains:

> Tort law is overwhelmingly common law, developed in case-by-case decisionmaking by courts. It is also influenced by statute. Early in the development of American tort law, doctrines emerged with respect to enforcement in tort law of standards derived from criminal statutes. Tort law is affected also by statutes explicitly aimed at changing substantive law rules previously developed by courts. Survival acts and wrongful death acts are examples.

W. L. Prosser, W. P. Keeton, Prosser and Keeton on Torts § 1, at 19 (5th ed. 1984).

As Prosser demonstrates, wrongs recognized at law are corrected as provided by law. Legislatures in the Anglo-American system have long been held to possess the authority to expand or reduce claims and remedies available at common law. O. W. Holmes, The Common Law 112 (1881). The law of Montana has long recognized that the courts and the legislature establish the substantive law governing tort claims. Early Montana statutes contemplated passage of legislation altering the common law. For example, § 1-1-109, MCA, first enacted as part of the Bannack Statutes, states:

> The common law of England, so far as it is not repugnant to or inconsistent with the constitution of the United States or the constitution or laws of this state, is the rule of decision in all the courts of this state. (Emphasis added.)

13

Similarly, Montana law provides that there "is no common law in any case where the law is declared by statute." Section 1-1-108, MCA. And statutes in derogation of the common law are "to be liberally construed with a view to effect their objects and to promote justice." Section 1-2-103, MCA.

The legislature's exercise of its power to alter the common law supports in a large part our legal system. And as pointed out by Hillhaven, much of the legislation altering the common law concerns the legislature's decisions on the remedies, redress, or damages obtainable in various causes of action. For example, the legislature has arguably expanded liability in adopting comparative negligence in § 27-1-702, MCA. Similarly, in § 27-1-715, MCA, the legislature has provided a remedy where none previously existed by ordering courts to hold owners of vicious dogs strictly liable in particular circumstances. Recognition of human rights violations under Title 49 of the Montana Code Annotated, prohibition of certain trade practices in the insurance industry under Title 33 of the Montana Code Annotated, and expansion of parents' liability for children's torts (§ 40-6-237, MCA) are also instances where the legislature has acted to expand available causes of action, remedies, redress, and damages. Other examples undoubtedly exist, and where these legislative expansions govern causes of action, courts and administrative bodies are bound to follow their mandate.

Legislative decisions to expand liability to further various policy objectives are debated and passed almost routinely. In a like manner, for policy reasons, the Legislature debates and passes statutes that take away causes of action and/or constrict liability. The following are examples: abolition of a cause of action for alienation of affection (§ 27-1-601, MCA), abolition of a cause for breach

14

of promise to marry (§ 27-1-602, MCA), protection for certain persons against a cause of action for libel (§ 27-1-804, MCA), liability limitations for those rendering emergency care at an accident scene (§ 27-1-714, MCA), liability limitations for those furnishing alcoholic beverages (§ 27-1-710, MCA), liability limitations for persons donating food for charity (§ 27-1-716, MCA), liability limitations for agents and volunteers of nonprofit corporations, (§ 27-1-732, MCA), and liability limitations for nonprofit organizations sponsoring rodeos and other events, (§ 27-1-733, MCA). Laws on livestock in open range constitute another legislative limit on liability of parties who are arguably tort-feasors. Section 60-7-202, MCA. Landowners also benefit from legislative limits on liability. For example, under § 23-2-321, MCA, a landowner owes only a duty for acts or omissions that constitute willful or wanton misconduct to individuals making recreational use of surface waters flowing over or through the landowner's property. Similarly, from a remedy and redress standpoint, property owners benefit from statutory provisions exempting certain property from execution. The Index to the Montana Code Annotated lists over sixty types of property statutorily exempt from execution. These and other statutes constrain liability and limit remedies and redress available at law.

In actions governed by the common law, this Court has also established limitations and expansions of liability. For example, in Miller v. Fallon County (Mont. 1986), 721 P.2d 342, 43 St.Rep. 1185, this Court abrogated interspousal tort immunity. Similarly, this Court, acting in its role as lawmaker, recently imposed on employers the duty of good faith and fair dealing. Gates v. Life of Montana Insurance Company (1982), 196 Mont. 178, 638 P.2d 1063. In another decision, breach of the duty of good faith and fair dealing

15

arising from obligations in a lease justified an award of punitive damages. Nicholson v. United Pacific Insurance Co. (1985), 219 Mont. 32, 710 P.2d 1342.

This Court has also refused to expand common law. For example, this Court has affirmed a trial court's decision disallowing evidence of emotional harm to a shareholder where the tort was committed against the shareholder's corporation. Moats Trucking Co. v. Gallatin Dairies (Mont. 1988), 753 P.2d 883, 45 St.Rep. 772. Another case held that the guarantee under Article II, § 16, does not abrogate a statute of limitations defense. State v. Perry (Mont. 1988), 758 P.2d 268, 45 St.Rep. 1192.

The above cited examples of legislative and judicial limitations illustrate that the law, for a variety of policy reasons, refuses to provide a cause of action, remedy and redress for every injury. This proposition is expressed in Latin as damnum absque injuria, meaning a "loss which does not give rise to an action for damages against the person causing it." Black's Law Dictionary 345 (4th ed. 1979). The legislation at issue here similarly alters common-law rights and duties and arguably denies a cause of action, remedy, and redress for injuries recognized at common law. If Article II, § 16, guarantees a fundamental right to full legal redress as embodied in common-law causes of action, then a myriad of legislation altering common law in a restrictive manner, as well as the Act, denies this fundamental right. Shea addressed this issue:

> If the contention of counsel should be upheld, the consequence would be that the legislature would be stripped of all power to alter or repeal any portion of the common law relating to accidental injuries or the death of one person by the negligence of another.

16

> It is true the legislature cannot destroy vested
> rights. Where an injury has already occurred for
> which the injured person has a right of action, the
> legislature cannot deny him a remedy. But at this
> late day it cannot be controverted that the
> remedies recognized by the common law in this class
> of cases, together with all rights of action to
> arise in [sic] future may be altered or abolished
> to the extent of destroying actions for injuries or
> death arising from negligent accident, so long as
> there is no impairment of rights already accrued.

Shea, 179 P. at 503. As Shea demonstrates, if Article III, §
6, is read as only a directive to the courts to provide for
equal administration of justice, then the rule that the
legislature may alter the common law does not conflict with
the speedy remedy guarantee. Therefore, the general rule
that no one has a vested interest in a rule of common law
refutes Meech's argument that the Act unconstitutionally
deprives him of his fundamental right to full legal redress.

C.    THE 1972 AMENDMENT TO ARTICLE III, § 6, DID NOT
      RECOGNIZE OR CREATE A FUNDAMENTAL RIGHT TO FULL
      LEGAL REDRESS.

In 1972, Article III, § 6 of the 1889 Constitution was
amended and inserted in the current Constitution as Article
II, § 16. The amendment added to the Article as underscored
below:

> Courts of justice shall be open to every person,
> and speedy remedy afforded for every injury of
> person, property, or character. No person shall be
> deprived of this full legal redress for injury
> incurred in employment for which another person may
> be liable except as to fellow employees and his
> immediate employer who hired him if such immediate
> employer provides coverage under the Workmen's
> Compensation Laws of this state. Right and justice

shall be administered without sale, denial, or delay.

In _Reeves_, the amended version of Article III, § 6 of the 1889 Constitution was held not to constrict the legislature's decision to alter common law:

> As indicated in _Shea_ and _Stewart_, the legislature is not constitutionally prohibited from eliminating common law rights which have not accrued or vested. The Constitution does not freeze common law rights in perpetuity.

_Reeves_, 551 P.2d at 652. There was no comment in _Reeves_ on the amendment to Article III, § 6.

1. _The Wording Itself._ _White_ and _Pfost_, without discussing governing precedent, reached the opposite conclusion construing Article II, Section 16 of the 1972 Montana Constitution on issues involving governmental immunity and equal protection. _White_ held that Article II, § 16, "guarantees that all persons have a speedy remedy for _every_ injury," and thus the classification resulting from a cap on tort damages awarded against state governmental entities violated equal protection. _White_, 661 P.2d at 1275 (emphasis added). _White_ then concluded that the legislation violated the guarantee because no compelling state interest justified denying the fundamental right to full legal redress for all injuries. _White_, 661 P.2d at 1275.

In _Pfost_, this Court faced an equal protection challenge to an amended version of the damages cap at issue in _White_. _Pfost_ cited _White_ and again held that Article II, Section 16, provides a "constitutional right to full legal redress for injury." The phrase "full legal redress" from Article II, § 16, played an important role in this determination:

18

> The use of the clause "this full legal redress" has major significance. It obviously and grammatically refers to the "speedy remedy afforded for every injury of person, property, or character." The adjective "this" means the person, thing or idea that is present or near in place, time or thought or that has just been mentioned. Webster's New Collegiate Dictionary (1981). The constitutional framers thus construed a "speedy remedy" as comprehending "full legal redress." A state constitutional right to full legal redress was thereby created. Any state statute that restricts, limits, or modifies full legal redress for injury to person, property or character therefore affects a fundamental right and the state must show a compelling state interest.

Pfost, 713 P.2d at 503.

There are flaws in this reasoning. As pointed out by Justice Weber's dissent in White, rules on the construction of constitutional guarantees favor interpretations of the guarantees in line with former judicial decisions where a constitutional convention has approved a similar or identical provision in a new constitution. White, 661 P.2d at 1279 (citing 2A C. Sands, Sutherland Statutory Construction § 45.12, at 37 (4th ed. 1973)). If "this full legal redress" refers to the speedy remedy in the first clause, then the two references are identical and the Convention approved Shea's and Stewart's definition of the guarantee. Shea and Stewart leave little doubt that our remedy provision does not guarantee a fundamental right to a particular cause of action, remedy, or redress. As discussed below, the delegates narrowly drafted the amendment to accomplish the single purpose of limiting the lawmakers' power in restricting third party actions in workers' compensation law.

Reliance in Pfost on the definitional and grammatical construction of the guarantee is flawed in other ways as well. For example, the word:

19

> "injury" as employed in such a constitutional declaration implies the doing of some act which constitutes an invasion of a <u>legal right</u> as established by <u>statutory</u> or common <u>law</u>, . . .

16A Am. Jur. 2d <u>Constitutional Law</u> § 616 at 562-63 (2d ed. 1979) (emphasis added). Or, as stated by one commentator, a "recognized, pre-existing injury is the predicate, not the subject of the clause." Schuman, <u>Oregon's Remedy Guarantee</u>, 65 Or. L. Rev. 35, 67 (1986).

Similarly, the redress referred to is <u>legal</u> redress. Legal means:

> Conforming to the law; according to law; required or permitted by law; not forbidden or discountenanced by law; good and effectual in law.

Black's Law Dictionary 803 (5th ed. 1979). Legal redress, then, is redress as provided by law, and redress and remedy are necessarily connected to what the law defines as a cause of action.

The words "actions," "cause of action," "right," "remedy," and "redress" are often used in a legal sense so that one implies the other. In fact, they are so related that at times one necessarily implies the other. However, there are some important distinctions which must be maintained. The term "cause of action" has been defined as follows:

> "[T]he fact or facts which establish or give rise to a right of action, the existence of which affords a party a right to judicial relief." The cause of action itself is distinguishable from the form it assumes in its prosecution in the courts. The facts constitute the cause of action, and the legal form used to enforce the action is the remedy.

20

State v. Preston (Ohio 1962), 181 N.E.2d 31, 36 (quoting Norwood v. McDonald (Ohio 1943), 52 N.E.2d 67, 72). The maxim, "For every wrong there is a remedy" thus bestows upon the person who may be wronged the right to seek redress to be made whole again in an action, whereas the facts which entitle a claimant to legal redress is denominated the "cause of action." Remedy is neither "redress" nor "relief." Remedy is "[t]he means by which a right is enforced or the violation of a right is prevented, redressed, or compensated." Black's Law Dictionary 1163 (5th ed. 1979). Therefore, the Act does not deny full legal redress or a speedy remedy. It simply defines what constitutes the facts which must be established to obtain remedy and redress in the context of wrongful discharge.

Similarly, the guarantee of a "speedy remedy" in the first clause of Article II, § 16, means such remedy as is provided by law. This "full legal redress," following the guarantee of a speedy remedy, refers to the equal right to be made whole again by what the law defines as a cause of action and its elements. Legal requirements and restrictions, as discussed more fully below, may be part of the entire package the law calls a cause of action, remedy, and redress. These restrictions and requirements are not established by our Constitution. Rather, it is the duty of the courts and the legislature to establish what constitutes available causes of action, remedies, and redress. Thus, we disagree with the notion that the proper grammatical and definitional construction of the words in Article II, § 16 of the Montana Constitution supports the existence of a fundamental right to redress so that the legislature may not alter causes of actions except by a showing that the legislation serves a compelling state interest. There must be the basis or

21

underpinning of a cause of action and remedy as defined by the lawmakers before one arrives at the point of redress.

2. <u>The "Intent of the Framers."</u> Basic rules of construction favor deriving the meaning of Article II, § 16, from its face. From our discussion above, and apart from what is referred to later in this opinion as the <u>Ashcraft</u> amendment, it is apparent that the words of Article II, § 16, only mandate that the courts provide equal access to causes of action and remedies established by the courts or the legislature. However, even if an ambiguity exists, the debates at the 1972 Constitutional Convention reinforce our initial conclusion.

<u>White</u>'s and <u>Pfost</u>'s interpretation of the effect of the 1972 amendment to the remedy provision ignores the specific meaning ascribed to the provision during debates at the 1972 Constitutional Convention. <u>Pfost</u>, 713 P.2d at 508 (Turnage, C.J., dissenting). Moreover, the majority's analysis in these decisions overlooks the explanation of the amendment in the Official Text with Explanation of the Proposed 1972 Constitution, a document circulated to inform voters of the content of the Constitution prior to the vote on its adoption in 1972. Our beginning discussion focuses on the proceedings at the Constitutional Convention.

The record from the Constitutional Convention of 1972 demonstrates that the addition to Article III, § 6, was meant to address a specific problem created by this Court's interpretation of a workers' compensation statute:

> DELEGATE MURRAY: The committee voted unanimously to retain this section with one important addition. The provision as it stands in the present Constitution guarantees justice and a speedy remedy for all without sale, denial or delay. The Committee felt, in light of a recent interpretation of the Workmen's Compensation law, that this remedy

22

needed to be explicitly guaranteed to persons who may be employed by one covered by Workmen's Compensation to work on the facilities of another. Under Montana law, as announced in the recent decision of Ashcraft versus Montana Power Company, [156 Mont. 368, 480 P.2d 812] the employee has no redress against third parties for injuries caused by them if his immediate employer is covered under the Workmen's Compensation law. The committee feels that this violates the spirit of the guarantee of a speedy remedy for all injuries of person, property or character. It is this specific denial, and this one only, that the committee intends to alter with the following additional wording: [Delegate Murray reads the amendment].

Montana Constitutional Convention, Vol. V, at 1753-54 (emphasis added). Following Delegate Murray's explanation of the Ashcraft amendment, Delegate Habedank moved for its deletion:

DELEGATE HABEDANK: Mr. President [Chairman], ladies and gentlemen. I have no objection to this being in here if you put it in here with full knowledge of what you are doing. The decision in the Ashcraft case, which I heard and which was brilliantly argued by Mr. Dahood, made quite a change in what a lot of us thought the law was. However, they were interpreting a specific statute of the State of Montana. All that is necessary to change their interpretation is to amend the statute of the State of Montana. And you, if you adopt this particular provision, are writing into the Constitution by vote of a majority of this group what I consider to be strictly statutory matter.

Montana Constitutional Convention, Vol. V, at 1755. Delegate Habedank also expressed concern that the addition would extend liability for workers' injuries beyond correcting the decision in Ashcraft:

As I view this amendment, it will not allow anyone to recover from anyone else without negligence on

23

the part of the person being charged. However, it will eliminate the ability of you as an owner to hire an independent contractor, require him to carry Workmen's Compensation as a part of the coverage, and be assured that you will not be sued on a third party claim.

Montana Constitutional Convention, Vol. V, at 1275. Delegate Dahood, Chairman of the Convention's Bill of Rights Committee, responded to both arguments made by Habedank:

I have heard this argument in the Supreme Court, an argument that had no basis in logic. I have heard it by several defense counsel who represent the best of corporate interests, that this is going to affect the individual property owner, and if he hires a contractor, he is going to be exposed to a liability that is unprecedented and they did not experience before. This it totally untrue. This section is doing nothing more, and the wording has been very precisely selected to make sure that it does nothing more, than place the injured working man back in the status that he enjoyed prior to 1971, a very basic constitutional right which he enjoyed for 80 years in the State of Montana. . . . Regardless of all this conflict, this technicality, having to use the word "Workmen's Compensation" in this particular section, which we didn't want to do, because the minute we did it we knew that somebody would jump up and say it's legislative, but if you're going to draft something with precision and you want to make sure that all that you're doing is returning the law to what it was prior to this decision a year ago, you are compelled, sometimes, in fashioning this precise language to use language that may be seized upon by someone else as legislative. It is not. It is giving back a basic constitutional right that the citizen of Montana had prior to that particular decision.

Montana Constitutional Convention, Vol. V, at 1255-57 (emphasis added).

It is perhaps ironic that the convention delegates amended the Constitution to correct this Court's restrictive

24

interpretation of a legislative enactment, and subsequently this Court in White and Pfost interpreted the addition to constrict the power of the legislature to alter the common law. At any rate, the testimony before the Convention demonstrates that the amendment to Article II, Section 16, was to operate in only one particular area of law. Specifically, the addition prevents lawmakers, that is both the courts and the legislature, from denying workers' compensation claimants a cause of action against negligent third parties for job related injuries. The amendment did not seek to define "full legal redress" as a fundamental right which could not be altered by the legislature. The delegates sought to overturn Ashcraft, not Shea. The entire discussion presupposes the existence of legislative powers to alter causes of action, remedies, and redress.

The narrow purpose the delegates ascribed to the change in the remedy guarantee is further reflected in the Proposed 1972 Constitution for the State of Montana, Official Text with Explanation, circulated to the voters prior to the vote on adopting the 1972 Constitution. According to the explanation in the voters' information pamphlet, the amendment:

> Adds to 1889 constitution by specifically granting to a person injured in employment the right to sue a third party causing the injury, except his employer or fellow employee when his employer provides coverage under workmens [sic] compensation laws.

Proposed 1972 Constitution for the State of Montana, Official Text with Explanation, at 6.

In summary, the history of our remedy guarantee, the rule that the legislature may alter the common law, and the wording of Article II, § 16, support Hillhaven's assertions

25

that no fundamental right exists to the common-law claims asserted by Meech. The role the judiciary must maintain in interpreting constitutional limitations affecting the plenary power possessed by the people through their legislature, and through their initiative and referendum powers, also supports Hillhaven's assertions.

D.  Deriving A New Fundamental Right From Article II, § 16, Violates Separation Of Powers.

Both courts and legislatures make the substantive law. The Montana Legislature derives its power to make law from the Constitution's grant of plenary power in Article V, § 1:

> The legislative power is vested in a legislature consisting of a senate and a house of representatives. The people reserve to themselves the powers of initiative and referendum.

One conclusion which could be drawn from an application of White and Pfost to the legislation at issue in this case is that while the legislature may play a role in expanding common-law causes of action, its attempts to restrict causes of action newly created by this Court fails under the guarantee in Article II, § 16. Yet, the general rule states otherwise:

> [A] constitutional provision that courts of justice shall be open to every person, and speedy and certain remedy afforded for every wrong and for every injury to person, property, or reputation, is not intended as a limitation upon the legislative branch of the government where the legislation involved deals with rightful subjects of legislation.

26

16A Am. Jur. 2d Constitutional Law § 616, at 564 (2d ed. 1979) (emphasis added); and see Salt Lake City v. Utah Light & Traction Co. (Utah 1918), 173 P. 556 (provision only applies to judicial questions, not meant to allow courts to usurp legislative power); Wagoner County Election Board v. Plunkett (Okla. 1956), 305 P.2d 525 (provision provides mandate to judiciary, not intended as a limitation on legislative branch).

The interpretation of Article II, Section 16, called for by Meech would prevent the legislature and the people through the initiative process from restricting or modifying the common law relative to injuries of person, property, or character. Only this Court's reasoning (good or bad), however, would restrict this Court's own lawmaking function. Our decision to limit a cause of action would withstand the strict scrutiny mandated by Article II, § 16; we would be applying the test. But a similar decision made by the legislature could be subject to much closer scrutiny. This Court would act as the ultimate authority in a vast, expanding, and ever changing field of law governing important social and economic rights and duties. It could exclude the legislature from deciding: What are injuries to an individual's person, property, or reputation; what wrongs are actionable; what remedies are available; and what redress will be given. The present appeal presents this separation of powers issue.

Gates expanded the law of wrongful discharge by defining as an injury the breach of the implied covenant of good faith and fair dealing. Similarly, Nicholson defined the same injury in the context of a leasehold dispute. Under White's and Pfost's interpretation of Article II, § 16, those recently recognized injuries would remain a part of our law despite a legislative mandate to the contrary. Any change in

27

such determinations could only be accomplished through constitutional amendment. We agree with Chief Justice Turnage's dissent in Pfost on this aspect of the issue:

> There further can be no question that our courts are open to every person and speedy remedy afforded for every injury of person, property, or character; however, this does not mean that the people have been denied the right to act through their legislature in providing a system of law that may set forth the scope and extent of the remedies provided by law. For this Court to decide otherwise requires a denial of the doctrine of separation of powers in Article III, Section 1, of the Montana Constitution.

Pfost, 713 P.2d at 514 (Turnage, C.J., dissenting).

### E. Meech's Arguments Are Inapposite.

Meech has several contentions addressing the arguments supporting Hillhaven's position. First, Meech points out that in State ex rel. Montana Citizens for the Preservation of Citizens' Rights v. Waltermire (Mont. 1987), 738 P.2d 1255, 44 St.Rep. 913, this Court declared null and void the effect of a voter initiative passed in 1986 amending Article II, § 16, to overrule White and Pfost. The amendment was held invalid because of an error in the voter information pamphlet. Montana Citizens, 738 P.2d at 1264. Meech asserts that the fundamental right to full legal redress remains in Montana law because the legislature passed the Act under the authority of the invalid amendment.

This proposition depends on the continued vitality of White and Pfost. We are overruling White and Pfost and any decisions relying on White and Pfost to the extent that they hold Article II, § 16, guarantees a fundamental right to a particular cause of action, remedy, or redress.

28

Meech further contends that the legislation at issue in Shea must be distinguished from the Act. Meech asserts that in Shea, the modification of common law benefited workers, but here, according to Meech, the legislation only "creates employers' defenses and eliminates many employees' claims for recovery." We disagree that the Act must be distinguished from the legislation at issue in Shea for the purpose of testing its constitutionality under Article II, § 16. Shea analyzed the trade-off in employees' and employers' interests as a result of the passage of workers' compensation legislation, but the holding rested on an interpretation of Article III, § 6, as only a mandate to the courts to provide for the equal administration of justice. Shea, 179 P. at 502. Thus, Shea does not require this Court to analyze whether the Act provides an adequate trade for the loss of common-law wrongful termination claims.

However, this Court's decision in Corrigan could be construed as placing this jurisdiction in with those that require an adequate substitute for legislative acts abrogating common-law remedies. See B. R. Burke, Constitutional Initiative 30: What Constitutional Rights did Montanans Surrender in Hopes of Securing Liability Insurance, 48 Mont. L. Rev. 53, 66 (1987). Even if Montana law required an adequate substitute for legal remedies abrogated by the legislature, as explained below, we disagree that no adequate remedy for common-law wrongful discharge exists under the Act. Therefore, we do not reach the issue.

In conclusion, we answer, "No" to the first question submitted by the United States District Court. Article II, § 16, does not render the Act unconstitutional as depriving an individual, in this case Meech, of a fundamental right to the common-law actions he alleges.

## II.

THE ACT SURVIVES EQUAL PROTECTION SCRUTINY BECAUSE IT IS RATIONALLY RELATED TO A LEGITIMATE STATE INTEREST.

The second question certified from the United States District Court concerns the validity of the Act's specific limitations on damages. The issue as framed is whether the Act's prohibition on the recovery of noneconomic damages and punitive damages violates Article II, § 16. Our discussion in answer to this question necessarily extends to an analysis of the equal protection guarantee found in Article II, § 4 of the Montana Constitution.

White and Pfost interpreted Article II, § 16, as guaranteeing a fundamental right of full legal redress for "all recognized compensable components of injury, including the right to be compensated for physical pain and mental anguish and the loss of enjoyment of living." White, 661 P.2d at 1275. These decisions then went on to hold that the legislation at issue violated the equal protection guarantee because no compelling state interest justified denying the fundamental right found in Article II, § 16, to the class of claimants affected by the damages limitation at issue. Here, the question involving the Act's damages limitation is similar, and more properly framed as:

> Do the limitations on the recovery of certain damages in the Act violate equal protection because the Act unconstitutionally burdens a class of claimants seeking damages for wrongful discharge?

Selection of the proper equal protection test is our first task in determining this issue.

As discussed in the previous section, no fundamental right to "full legal redress" exists under Article II, § 16. Meech alleges no other infringement of fundamental rights by

30

operation of the Act, and no suspect classifications are involved. The strict scrutiny test applies only where legislative classifications infringe on a fundamental right, or where the legislature employs suspect classifications such as race or national origin to define the benefited or burdened class. See J. E. Nowak, R. D. Rotunda, & J. N. Young, Constitutional Law Ch. 16, § I, at 596-98 (2d ed. 1983). Therefore, the strict scrutiny test does not apply.

We also refuse to employ middle tier scrutiny to analyze classifications created under the Act. The United States Supreme Court has employed the middle tier criterion in only a few situations which are not applicable here. See generally Butte Community Union v. Lewis (1986), 219 Mont. 426, 432-33, 712 P.2d 1309, 1312. This Court's decisions have applied the test only where specific directives in the Montana Constitution protected interests in education and welfare. See Butte Community Union, 712 P.2d at 1314; Deaconess Medical Center of Billings Inc. v. Department of Social and Rehabilitation Services (Mont. 1986), 720 P.2d 1165, 43 St.Rep. 1112; State ex rel. Bartmess v. Board of Trustees (Mont. 1986), 726 P.2d 801, 43 St.Rep. 1713. Our interpretation of Article II, § 16, as only a directive to the courts distinguishes the interest at issue here from the interests at stake in those cases.

We determine that the proper level of scrutiny for the classifications created by the Act's limitation on employers' liability is provided by the rational basis test. We further find that the Act's provisions on damages pass equal protection muster because the Act's disparate treatment of similar claims is rationally related to a legitimate state interest.

Until recently, the fundamental body of law governing available damages in the employment area has been contract

31

law. Courts, by virtue of their power to alter the common law, have expanded employers' liability by recognizing tort claims in the employment context. The legislature has now acted to reverse this trend by restricting damages for wrongful discharge. This decision to limit liability "emerges as a classic example of an economic regulation--a legislative effort to structure and accommodate 'the burdens and benefits of economic life.'" Duke Power Co. v. Carolina Environmental Study Group (1978), 438 U.S. 59, 83, 98 S.Ct. 2620, 2636, 57 L.Ed.2d 595, 617-18. A statutory "limitation on recovery is a classic economic regulation, . . . [which] must be upheld if it is reasonably related to a valid legislative purpose." Boyd v. Bulala (W.D. Va. 1986), 647 F. Supp. 781, 786 (finding heightened scrutiny inappropriate for reviewing liability-limitation under requirements of Virginia's remedy guarantee).

The Court in Duke Power pointed out that use of the rational basis test harmonizes with the rule that the legislature may alter the common law:

> Our cases have clearly established that "[a] person has no property, no vested interest, in any rule of the common law." [citation omitted]. The "Constitution does not forbid the creation of new rights, or the abolition of old ones recognized by the common law, to attain a permissible state object," [citation omitted], despite the fact that "otherwise settled expectations" may be upset thereby.

Duke Power, 438 U.S. at 88, n. 32. The California Supreme Court also emphasized that where the legislature may alter the common law, the rational basis test applies to testing liability-limitations:

32

> [O]ur past cases make clear that the Legislature
> retains broad control over <u>the measure</u>, as well as
> <u>the timing</u>, of damages that a defendant is
> obligated to pay and a plaintiff is entitled to
> receive, and that the Legislature may expand or
> limit recoverable damages so long as its action is
> rationally related to a legitimate state interest.

Fein v. Permanente Medical Group (Cal. 1985), 695 P.2d 665, 680 (emphasis in original). This Court, too, in <u>Reeves</u>, recognized that the rational basis test applied to analyzing whether liability-limitations imposed through a special statute of limitations for architects and builders violated equal protection:

> The test of the constitutionality of class
> legislation is whether the classification has some
> reasonable, just and practical basis and whether
> the law operates equally upon every person within
> the class. [citations omitted] A statute will not
> be stricken down upon constitutional grounds unless
> its violation of the fundamental law is clear and
> palpable, and the classification it makes is
> illusory and unreal. [citation omitted] Applying
> these tests, section 93-2619, R.C.M.1947, does not
> violate equal protection of the laws.

<u>Reeves</u>, 551 P.2d at 652. We hold that these decisions provide the proper rule on which equal protection test applies to analyzing the Act.

Initially, in applying the rational basis test, it is important to note that

> [i]t has long been the general rule of this Court
> that statutes carry a presumption of
> constitutionality. [citation omitted] Generally,
> "whenever there are differing possible
> interpretations of [a] statute, a constitutional
> interpretation is favored over one that is not."

33

Brewer v. Ski Lift, Inc. (Mont. 1988), 762 P.2d 226, 228, 45 St.Rep. 1769, 1772 (quoting Department of State Lands v. Pettibone (1985), 216 Mont. 361, 374, 702 P.2d 948, 956).

Another rule pertaining to testing legislation under minimal scrutiny analysis mandates that this Court

> must not be concerned with the expediency of the statute:
>
> "What a court may think as to the wisdom or expediency of the legislation is beside the question and does not go to the constitutionality of the statute. We must assume that the Legislature was in a position and had the power to pass upon the wisdom of the enactment, and in the absence of an affirmative showing that there was no valid reason behind the classification, we are powerless to disturb it."

McClanathan v. Smith (1980), 186 Mont. 56, 66, 606 P.2d 507, 513 (quoting State ex rel. Hammond v. Hager (1972), 160 Mont. 391, 399, 503 P.2d 52, 56). Moreover, in "applying the equal protection clause to social and economic legislation, great latitude is given to state legislatures in making classifications." McClanathan, 606 P.2d at 513.

The remedy provision in the Act, set out below, arguably classifies wrongful discharge claimants based on the magnitude of harm:

> Remedies. (1) If an employer has committed a wrongful discharge, the employee may be awarded lost wages and fringe benefits for a period not to exceed 4 years from the date of discharge, together with interest thereon. Interim earnings, including amounts the employee could have earned with reasonable diligence, must be deducted from the amount awarded for lost wages.
> (2) The employee may recover punitive damages otherwise allowed by law if it is established by clear and convincing evidence that the employer engaged in actual fraud or actual malice in the

34

discharge of the employee in violation of
39-2-904(1).
(3) There is no right under any legal theory
to damages for wrongful discharge under this part
for pain and suffering, emotional distress,
compensatory damages, punitive damages, or any
other form of damages, except as provided for in
subsections (1) and (2).

Section 39-2-905, MCA. Claimants alleging only wage loss
within a four year period, and only noneconomic damages, are
not adversely affected by the Act's remedy provision.
Claimants seeking damages extending beyond four years, or
claimants suffering from noneconomic harm such as emotional
distress, are foreclosed from pursuing their claims by the
Act's remedy provision. Meech asserts that this difference
in available remedies violates equal protection guarantees.
In addition, Meech argues that the Act unconstitutionally
limits the availability of punitive damages.

The general rule on the plenary power of the legislature
in determining the availability of punitive damages refutes
Meech's argument that the Act unconstitutionally limits such
damages:

There is no vested right to exemplary damages and
the legislature may, at its will, restrict or deny
the allowance of such damages.

22 Am. Jur. 2d Damages § 239, at 326 (2d ed. 1965). See also
White, 661 P.2d at 1276 (tort claimants have no
constitutional right to punitive damages). We hold that the
Act's provision on punitive damages is constitutional.

We also hold that the Act's classification of claims by
available remedies passes equal protection muster. Again,
these types of limitations are not new to law. Limitations
on recovery for wrongful death, for recovery against common
carriers, and limits for damages on baggage claims are

35

classic examples of liability-limitations. As explained below, we conclude that that the Act rationally relates to promoting a legitimate state interest.

The legislative history of the Act demonstrates that lawmakers perceived an unreasonable financial threat to Montana employers from large judgments in common-law wrongful discharge claims. Testimony in legislative hearings also indicated to legislators that large judgments in common-law wrongful discharge cases could discourage employers from locating their businesses in Montana. The Act's limitation on damages is intended to alleviate these threats. Therefore, the Act passes muster on this leg of the test because promoting the financial interests of businesses in the State or potentially in the State to improve economic conditions in Montana constitutes a legitimate state goal. Buckman v. Deaconess Hospital (Mont. 1986), 730 P.2d 380, 386, 43 St.Rep. 2216, 2223.

We also conclude that the Act relates rationally to promoting Montana's economic interests. Some awards for common-law wrongful discharge have included wages which extend far into the claimant's employment future. See Stark v. Circle K Corp. (Mont. 1988), 751 P.2d 162, 45 St.Rep. 371. The effect of the Act's limitations on damages to four years lost wages rationally relates to reducing this potential liability. Moreover, the limit itself is not irrational or so arbitrary that the classification it creates violates equal protection. As a matter of policy, the legislature determined that four years should be the maximum period for consideration of wage loss reasoning that claimants could generally be expected to find similar employment by the end of this period. The time period in any given claim is necessarily speculative. However, statistics before the legislature supported the conclusion that most wrongful

36

discharge claimants with reasonable diligence will obtain other employment within the four year period. Therefore, judicial deference for the time period at issue is appropriate. See e.g., Duke Power, 438 U.S. at 91. The same sort of analysis applies to the Act's limitations on damages for pain and suffering and emotional distress; the restriction on recovery rationally relates to the legislature's legitimate purpose of limiting employers' liability for wrongful discharge.

It could be surmised too that this particular limitation relates rationally to another legitimate legislative aim, that is, it provides for greater certainty in defining an employer's duties by recalling a contract law limitation on damages for pain and suffering. See e.g., § 27-1-310, MCA. As a corollary to this purpose, a greater certainty of the rights of employees also exists under the Act as a result of the "good cause" requirement.

For example, in computing contract damages according to the contemplation of the parties, recovery for

> mental anguish is not, as a general rule, allowed.
> . . . the courts evidently believe that the mental
> suffering which accompanies a breach of contract is
> too remote for compensation.

22 Am. Jur. 2d Damages § 195 (2d ed. 1965). Montana follows the general rule by prohibiting damages for emotional or mental distress in most contract actions. Section 27-1-310, MCA. In contrast, the law generally permits a broader measure of damages in personal injury actions:

> There is no fixed rule or exact standard by which
> damages can be measured in personal injury cases.
> The law does not assume that a particular injury
> calls for a definite amount of compensation, for
> just compensation may vary widely in different

cases, even where the physical injury is the same, especially where the injury is permanent, or where pain and suffering are involved. When a plaintiff suffers pain, fright, or humiliation because of a tort, dollars are awarded as "compensation" but not as the equivalent of what was suffered. Because of this lack of equivalence in a major portion of many personal injury awards, precise rules of damages are impossible to state.

22 Am. Jur. 2d Damages § 86 (2d ed. 1965) (emphasis in original). Montana also follows the general rule on damages for personal injury:

For the breach of an obligation not arising from contract, the measure of damages, except where otherwise expressly provided by this code, is the amount which will compensate for all the detriment proximately caused thereby, whether it could have been anticipated or not.

Section 27-1-317, MCA (emphasis added).

The differences in calculating personal injury damages and contract damages points out a problem with the emergence of tort claims in the employment relationship. Tort claims for at-will employees compensate for these workers' inability to control the term of their employment. Gates, 638 P.2d at 1066. Employers, however, are unable to plan for the extensive liability which may arise from damages available in these claims. Testimony in legislative hearings indicated that this is a source of great discontent in the Montana business community. The Act's limitation on noneconomic damages applies long-standing contract law in an attempt to solve this problem by dictating a more objective measure of damages. Under the Act, employers benefit because their potential liability is made more certain. Meanwhile, employees' control over the manner in which they are discharged remains, in part, as a result of the Act's "good

38

employees' cause" requirement.    The Act, in making this trade, is in no sense irrational.  Therefore, classifications in the Act satisfy the requirements of the rational basis test.

Finally, we address the argument mentioned above that Shea requires the legislature to provide adequate substitutes for causes of action abrogated by statute.  The Court in Duke Power faced a similar contention based on the Due Process Clause of the United States Constitution:

> The District Court held that the Price-Anderson Act contravened the Due Process Clause because "[t]he amount of recovery is not rationally related to the potential losses"; because "[t]he Act tends to encourage irresponsibility in matters of safety and environmental protection . . ."; and finally because "[t]here is no quid pro quo" for the liability limitations.  431 F. Supp. at 222-223.

Duke Power, 438 U.S. at 82.  The Court in Duke Power resolved the argument for requiring a quid pro quo as follows:

> Initially, it is not at all clear that the Due Process Clause in fact requires that a legislatively enacted compensation scheme either duplicate the recovery at common law or provide a reasonable substitute remedy.  However, we need not resolve the question here since the Price-Anderson Act does, in our view, provide a reasonably just substitute for the common law or state law remedies it replaces.

Duke Power, 438 U.S. at 88.

Here, too, the benefits of the Act for employees are not illusory.  Therefore, we need not reach the issue as posed by Meech because the Act provides a reasonably just substitute for the common-law causes it abrogates.

In some situations the Act may benefit employees by eliminating common-law defenses formerly available.    For

example, in Prout v. Sears (Mont. 1989), 772 P.2d 288, 46 St.Rep. 257, a majority of this Court explained that under prior Montana law, an employer could defend a discharge suit by claiming that the employee was let go for no cause:

> At the same time we give effect to the employment application and record time card. These give the employer the right to fire <u>without</u> <u>cause</u>.

<u>Prout</u>, 772 P.2d at 292 (emphasis added). Under the Act, the no-cause defense for discharging an employee who has worked beyond the probationary period is unavailable to most employers. Instead, employers may be subject to discharge only for good cause defined as:

> "Good Cause" means reasonable job-related grounds for dismissal based on failure to satisfactorily perform job duties, disruption of the employer's operation, or other legitimate business reason.

Section 39-2-903(5), MCA. Similarly, the good-cause provision may provide greater protection for an employee whose employer has carefully avoided giving objective manifestations of continued employment, a requirement for maintaining a cause of action for violation of the covenant of good faith and fair dealing under the former law. <u>Stark</u>, 751 P.2d at 166. Imposition of a good-cause requirement in discharge may also provide greater employee protection in situations, as in <u>Prout</u>, where employers sought to disclaim in the employment contract any objective manifestations of continued employment. The Act's provision allowing claims for prejudgment interest also betters the prior common-law provisions for recovery.

In addition to the amount awarded for lost wages, pensions, insurance benefits, and vacation time may be considered as fringe benefits under the statute. Section

39-2-903(4), MCA. All fringe benefits which would have accrued during the four year period following the discharge are available as damages under the Act. Therefore, the Act contemplates allowing some recovery for wrongful discharges which would otherwise deny retirement benefits, and more.

To summarize, greater certainty in the law may alleviate problems experienced by both employers and employees. As explained by one commentator:

> [T]he employees who benefit [under common-law cause of action] are few and far between, first, because of the difficulties involved in staying the course of a lengthy and expensive judicial process, and second, because of limitations inherent in the legal doctrines adopted by the courts.

Gould, Stemming the Wrongful Discharge Tide: A Case for Arbitration, 13 Emp. Rel. L.J. 404, 413 (1988). Therefore, Meech's argument that the Act provides an inadequate trade for prior common-law actions fails to provide authority for finding the Act unconstitutional.

In conclusion, Montana's remedy clause seeks to guarantee equal access to courts to obtain remedies for injuries as provided by governing law. It does not, however, impart a definition of what the law considers a remedy or full legal redress. Nor does it empower this Court to exclude the legislature from defining what are legal injuries.

Finally, we make clear here that the proper test to apply to the Act's classifications burdening one class and not another, is the rational basis test. The classifications created under the Act at issue here survive scrutiny under this test, and even if Montana law required a quid pro quo for the old causes of actions, the Act provides a reasonable

substitute. Thus, we answer "No" to both questions posed by the United States District Court.

_____
                                Justice

We Concur:

_____
                Chief Justice

_____

_____

_____

_____
                Justices

42

Mr. Justice John C. Sheehy, dissenting:


This is the blackest judicial day in the eleven years that I have sat on this Court. Indeed it may be the blackest judicial day in the history of the state. Certainly this decision is more regressive than the ill-boded Ashcraft v. Montana Power Company (1971), 156 Mont. 368, 480 P.2d 812 case, which deprived injured workers of their full legal redress against third party tortfeasors. The decision today cleans the scalpel for the legislature to cut away unrestrainedly at the whole field of tort redress. Perhaps worse by this decision today, the Court throws in the sponge as a co-equal in our tripartite state government.

I.

For the reader to understand the drastic ramifications of the "Wrongful Discharge From Employment Act" the whole of the Act must be set out. The legislation passed as Ch. 641, Laws of Montana (1987). A full copy of the text is attached to this dissent as Exhibit A. The bracketed numbers thereon indicate the present number of the code sections of the Act as they now appear in Montana Code Annotated.

The contraction of what was once in this state the tort of wrongful discharge is found principally in three sections of the Act, Section 4 [§ 39-2-904, MCA], Section 5 [§ 39-2-905, MCA] and Section 8 [§ 39-2-913, MCA].

Under Section 4 of the Act [§ 39-2-904, MCA] grounds for wrongful discharge are limited to three possibilities:

(1) It was in retaliation for the employees refusal to violate public policy or for reporting a violation of public policy;

(2) The discharge was not for good cause and the employee had completed the employers probationary period of employment; [under the Act, a probationer

has absolutely no right of recourse for a wrongful discharge] or

(3) The employer violated the express provisions of its own written personnel policy.

The attorneys in this case supporting the Wrongful Discharge From Employment Act filed briefs claiming that it provided great new rights for discharged workers. Not true. Each of the elements listed above was established by this Court in decisions heretofore made and each was fully available to wrongfully discharged employees, including probationers. Thus, the first element was recognized in Kenneally v. Orgain (1979), 186 Mont. 1, 606 P.2d 127, where we said:

> . . . It is only when a public policy is violated in connection with the wrongful discharge that the cause of action arises. Examples given by the courts are: refusal to perjure himself in the case of one employee; firing of another employee for asserting a right to obtain Workers' Compensation benefits to which he was statutorily entitled; and refusal of sexual relations.

Id., 186 Mont. at 6, 606 P.2d at 129.

As to the second element, where the discharge of the employee was not for good cause, we had protected the employee in cases before the adoption of this Act. In Ameline v. Pack and Company (1971), 127 Mont. 301, 45 P.2d 689, this Court found that the employer had not established good cause in the termination of an employee before the end of his one-year contract. Our recent cases of Prout v. Sears Roe Buck and Co., (No. 88-117, Mont. Decided February 16, 1989), 772 P.2d 288, 46 St.Rep. 257, and Hobbs v. Pacific Hide and Fur (No. 84-437, Mont. Decided March 31, 1989), 771 P.2d 125, 46 St.Rep. 544, confirmed that a discharge must be for good cause after the probationary period has elapsed.

These and other cases relied on the implied covenant of good faith and fair dealing.

The third element for which wrongful discharge is granted under the Act is if the employer violates the express provisions of its own written personnel policy. Here again, the legislature granted nothing that had not already been firmly established in our decisions. In Dare v. Montana Petroleum Marketing Company (1984), 212 Mont. 274, 687 P.2d 1015 (Weber, J.), we held that even an employment handbook promulgated by the employer was not essential for a cause of action for a breach of the implied covenant of good faith and fair dealing stating that:

> . . . [A]n employee is protected from bad faith or unfair treatment by the employer to which the employee may be subject due to the inherent inequality of bargaining power present in many employment relationships.. . .

Id., 668 P.2d at 1020, 212 Mont. at 282.

Violation of the employer's handbook procedures for termination which gave rise to a wrongful discharge action was firmly established in Gates v. Life of Montana Insurance Company (1982), 196 Mont. 178, 638 P.2d 1063, and Gates v. Life of Montana Insurance Company (1983), 205 Mont. 304, 668 P.2d 213. We followed that rule in Stark v. Circle K Corporation (1988), ___ Mont. ___, 751 P.2d 162; and Kerr v. Gibson's Products Company of Bozeman (1987), ___ Mont. ___, 733 P.2d 1292 (Turnage, J.); Flanigan v. Prudential Savings and Loan Association (1986), 221 Mont. 419, 720 P.2d 257; Krenshaw v. Bozeman Deaconess Hospital (1984), 213 Mont. 488, 693 P.2d 487;

The elements of wrongful discharge, as found in the Act, therefore, are but restatements of cases based on some judicial policy heretofore promulgated by this Court. While perforce, the legislature had to recognize at least those

- 45 -

three elements of wrongful discharge, it took care to provide that no significant amount of damages could be recovered by a wrongfully discharged employee even under those elements. A wronged employee's remedies are nearly emasculated under the Act.

Section 5 of the Act [§ 39-2-905, MCA] describes the recoverable remedies for a wrongfully discharged employee. He or she may recover no more than four years of lost wages and fringe benefits from both of which are deducted amounts the employees earned or could have earned with reasonable diligence during that period. Since Section 6 of the Act [§ 39-2-911, MCA] limits suits to one year from the date of discharge, the employee's loss is wholly speculative.

Section 5 of the Act completely wipes out any right of any discharged employee to damages for pain and suffering, emotional distress, compensatory damages or any other form of damages except the four years of mitigated lost wages and fringe benefits. These stricken elements of damages are traditionally allowed against tortfeasors, elements which we have supported in any number of cases, as proper items of recovery.

Finally, to make certain that a wronged employee would have to take his or her lumps without a legal basis for proper recovery, the legislature adopted Section 8 [§ 39-2-913, MCA] which states that no claim for discharge may arise from a tort or express or implied contract except as provided in the Act itself. The real purpose of Section 8 is to negate by elimination any possible employee claim of tort based upon an implied covenant of good faith and fair dealing in the employment contract. This provision takes Montana out of the mainstream of American legal thought.

Restatement (Second) of Contracts, § 205, provides:

> Duty of good faith and fair dealing. Every
> contract imposes upon each party a duty of good
> faith and fair dealing in its performance and its
> enforcement.

The duty of "good faith" is incorporated in the Uniform Commercial Code [§ 30-1-201(19); § 30-1-208, MCA]. A large and important body of oil and gas law is based upon implied covenants contained in oil and gas leases and other instruments. This Court has recognized that an implied covenant of good faith and fair dealing attends insurance policies. First Security Bank of Bozeman v. Goddard (1979), 181 Mont. 407, 593 P.2d 1040; State ex rel. Larson v. District Court (1967), 149 Mont. 131, 136, 423 P.2d 598, 600. We have also found a remedy for the breach of the implied covenant in the employment cases noted above, in Dare v. Montana Petroleum Marketing Company (1984), 212 Mont. 274, 687 P.2d 1015; in the attorney-client relationship, Morsen v. Espeland (1985), ___ Mont. ___, 696 P.2d 428; and in the dealings by banks with their customers, Tribby v. Northwestern Bank of Great Falls (1985), ___ Mont. ___, 704 P.2d 409; First National Bank in Libby v. Twombly (1984), 213 Mont. 66, 689 P.2d 1226. We found an implied covenant of good faith and fair dealing in real property lease agreements in Nicholson v. United Pacific Insurance Company (1985), ___ Mont. ___, 710 P.2d 1342.

The implied element of "good faith" connotes a moral quality "honesty of person, freedom from fraudulent intent, and faithfulness to duty or obligation." Raab v. Casper (1975), 124 Cal.Rptr. 590, 51 Cal.3d 866; Restatement (Second) of Contracts, § 205.

The nature and extent of an implied covenant of good faith and fair dealing is measured in any particular contract

by the justifiable expectations of the parties to the contract. Nicholson, supra.

The approval by this Court in this case of the elimination by the legislature of the element of good faith and fair dealing in employment contracts has the effect of reversing all of the employment cases this Court has handed down in the last decade. The elimination has a profound effect on the recovery of punitive damages. Although the Act here in question provides [Section 5(2)] for punitive damages in case of actual fraud or actual malice on the part of the employer, unless an employee can show an implied covenant of good faith and fair dealing in his employment contract, he will find no basis upon which punitive damages can be awarded to him.

The legislature, in effect, has converted the tort of wrongful discharge into a sort of contract action by the adoption of the Wrongful Discharge From Employment Act. The legislature refused, nonetheless, to provide all the elements of the damages allowable for breach of contract which ordinarily would compensate the party aggrieved for all of the detriment proximately caused by the breach and in the ordinary course of things likely to result therefrom. Section 27-1-311, MCA.

In a recent case, the Supreme Court of Nevada in K-Mart Corporation v. Ponsock (Nev. 1987), 732 P.2d 1364, found the implied covenant of good faith and fair dealing in the employment contract, and stated that even contract damages were inadequate in this type of case. The Nevada Court said:

> In this case we have a contract in which the relationship with the parties is in many ways analogous to those present in an insurance contract. Ponsock was just as dependent in "specially relying" on K-Mart's commitment to his extended employment and subsequent retirement benefits as is an insurance policyholder dependent

on the good faith indemnity promised by the insurance carrier. The special relationships of trust between _this_ employer and _this_ employee under _this_ contract under _this_ kind of abusive and arbitrary dismissal cries out for relief and for a remedy beyond that traditionally flowing from breach of contract. To permit only contract damages as the sole remedy for this kind of conduct would be to render K-Mart totally unaccountable for these kinds of actions. If all a large corporate employer had to do was to pay contract damages for this kind of conduct, it would allow and even encourage dismissals of employees on the eve of retirement with virtual impunity. Having to pay only contract damages would offer little or no determent to the types of practice apparently engaged in by K-Mart in this case. Further, an aggrieved employee, relying on, and anxiously awaiting his retirement benefits would not be made whole by an award of contract damages resulting from wrongful discharge, even if he were awarded the expected retirement benefit . . . After involving itself in a relationship of trust and special reliance between itself and its employee and allowing the employee to rely and depend upon continued employment and retirement benefits, the company, to serve its own financial ends, wrongfully and in bad faith breached the employment agreement. The jury specifically found this reliance and concluded that K-Mart was guilty of bad faith . . . (Emphasis in original.)

Id.,732 P.2d at 1372.

It is evident that the Wrongful Discharge From Employment Act adopted by the Montana legislature purporting to give a wronged employee some rights, instead, took away any possible right of meaningful recovery. The ominous implications of this Act for all employees not working under a union contract cannot be overstated. The longer the employee works for an employer, the greater reliance the employee places upon the employer's proffer of fringe benefits and retirement allowances, then the more the employee is at risk to be discharged, because the economic

result of a wrongful discharge to the employer, even if the employee's suit under the Act should be successful, is nothing but paltry damages to the employee and possible profit to the employer. The lack of legislative clout of the unorganized workers, although they may comprise a majority of the workers in this state, is demonstrated in that this patently unfair legislation in 1987 passed the State Senate without a no vote on third reading, and with but 16 no votes out of 100 in the State House of Representatives.

II.

When law can do no right
[Then] it be lawful that law can bar no wrong.

-William Shakespeare, King John (Magna Carta's John) Act III, Scene i.

Four centuries ago William Shakespeare stated in capsule the view of the majority of this Court in upholding the Act. The majority view is that the legislature can abolish any right of recovery and when it does courts are barred from awarding "full legal redress" under Art. II, Sec. 16, Montana State Constitution. So holding, the majority airily overrule Pfost v. State (1986), 219 Mont. 206, 713 P.2d 494; White v. State (1983), 203 Mont. 363, 661 P.2d 1272 and Corrigan v. Janney (1981), ___ Mont. ___, 626 P.2d 838. We submit that not only are these reversals overbroad, but they are clearly in error.

First let us examine the overruled cases. Corrigan v. Janney, supra, involved an appeal from a summary judgment granted in the District Court against a plaintiff in a wrongful death case. Janneys had leased living quarters to the Corrigans, and the leased premises were defectively wired so that Max Corrigan came in contact with the faucet on a bathtub and received an electrical shock which ultimately caused his death. The District Court, reading earlier cases

of this Court, decided that there was no cause of action by a tenant against the landlord for such a defect and granted summary judgment. This Court held (Harrison, J.) that there is in modern day usage a need for rental houses to be suitable for human occupation and that a cause of action for wrongful death in this case did exist. The Court cited Art. II, Sec. 16 of the Constitution and went on to state:

> It would be patently unconstitutional to deny a tenant all the causes of action for personal injuries or wrongful death arising out of the alleged negligent management of rental premises by a landlord. If this action were to be taken away, a substitute remedy would have to be provided. Arguably, the repair and deduct statute provides an alternative remedy for damage to the leasehold interest. However, in no way can it be considered an alternative remedy for damages caused by personal injury or a wrongful death. (Emphasis supplied.)

Id., 626 P.2d at 840.

Justice Harrison then noted a controlling statute and went on to state:

> In summary, we overrule Dier v. Mueller, supra, and hold that our Constitution requires that plaintiff have a form of redress for wrongful death and survivor damages. We hold that § 58-607 R.C.M. (1947), is controlling and that one is responsible for injury occasioned to another by want of ordinary care subject to the defenses and contributory negligence or assumption of risk.

Id., 626 P.2d at 841.

Thus Corrigan held that § 58-607 provided a statutory basis for recovery in this wrongful death case, and that Art. II, Sec. 16 constitutionally guaranteed the right of redress in that case. Why the majority overrules that case is beyond my conjecture.

In White v. State, supra, Karla White sued the State of Montana alleging that the State was grossly negligent in

permitting an allegedly violent and dangerous person to escape from the mental hospital at Warm Springs and to remain free for a period of 5 years without serious attempts to locate and reincarcerate the escaper. Karla was brutally attacked by this individual about 5 years after he had escaped from Warm Springs.

The legislature meanwhile had passed § 2-9-104, MCA, which provided that any governmental unit, including the State, was not liable for noneconomic damages, nor for any economic damages in excess of $300,000 for any one claimant. If this statute were upheld, Karla's right of recovery, premised upon severe emotional injuries which she received from the attack but insignificant economic damages, would be effectively wiped out. The District Court held that the statutory limitation on governmental liability for damages was unconstitutional and granted summary judgment in favor of Karla. The State appealed to this Court, which said:

> Article II, Section 16 of the Montana Constitution guarantees that all persons shall have a "speedy remedy . . . for every injury of person, property, or character." In Corrigan v. Janney (1981), Montana, 626 P.2d 838, this Court held that it is "patently unconstitutional" for the legislature to pass a statute which denies a certain class of Montana Citizens their causes of action for personal injury and wrongful death. We affirm and redefine our holding in Corrigan v. Janney, supra; we hold that the Montana Constitution guarantees that all persons have a speedy remedy for every injury. The language "every injury" embraces all recognized compensable components of injury including the right to be compensated for physical pain and mental anguish and the loss of enjoyment of living. Therefore, strict scrutiny attaches. (Emphasis supplied.)

Id., 661 P.2d at 1275.

In White, this Court found no compelling state interest to classify tortfeasor victims on whether they had been

injured by a nongovernment tortfeasor or by a government tortfeasor. The Court struck down a statute which allowed recovery to plaintiffs damaged economically up to $300,000, but totally denied recovery for noneconomic damages; and further, the statute classified victims of government tortfeasors by the severity of the victim's injuries.

It should be clear to all that § 2-9-104, MCA, denied the equal protection of the law to White because the statute discriminated between tortfeasors injured by government agents or by private defendants; and as between persons injured by government tortfeasors, it discriminated on the basis of economic and noneconomic damages. Certainly this Court in White enforced the state constitutional mandate to courts that "Right and justice shall be administered without . . . denial . . ." Art. II, Sec. 16.

Before adverting to Pfost v. State, supra, we set out for the convenience of the reader the full text of Art. II, Sec. 16, of the State Constitution:

> Courts of justice shall be open to every person, and speedy remedy afforded for every injury of person, property, or character. No person shall be deprived of this full legal redress for injury incurred in employment for which another person may be liable except as to fellow employees and his immediate employer who hired him if such immediate employer provides coverage under Workmens' Compensation Laws of this state. Right and justice shall be administered without sale, denial, or delay. (Emphasis added.)

Pfost v. State involved a plaintiff who had been injured when his truck-tractor collided with a bridge on an extremely icy and hazardous highway. He alleged no precautions had been taken by the State to remedy the hazardous condition although three separate wrecks had occurred prior to Pfost's arrival. Pfost suffered injuries which eventually made him a quadriplegic. He sought compensatory damages of 6 million

- 53 -

dollars. In the meantime, the legislature had adopted a new statute regarding the liability of the State in tort cases, limiting any or all recovery to $300,000 for a single person. Section 2-9-107, MCA. Pfost's medical expenses alone exceeded that sum. The District Court held the statute to be unconstitutional as a denial of equal protection and the State appealed. In Pfost, we followed White v. State, supra, holding that Art. II, Sec. 16, 1972 of Montana Constitution, granted a fundamental right to access to courts for a full legal redress and on the basis of equal protection found that § 2-9-107, MCA, discriminated improperly between those with minor injuries and those with catastrophic injuries resulting from the tort of a government agent. In passing on the language of Art. II, Sec. 16, supra, we stated:

> The use of the clause "this full legal redress" has major significance. It obviously and grammatically refers to the "speedy remedy afforded for every injury of person, property, or character." The adjective "this" means the person, thing, or idea that is present or near in place, time, or thought or that has just been mentioned. Websters New Collegiate Dictionary (1981). The constitutional framers thus construed a "speedy remedy" as comprehending "full legal redress." A state constitutional right to full legal redress was thereby created. Any state statute that restricts, limits, or modifies full legal redress for injury to person, property, or character therefore affects a fundamental right and the State must show a compelling state interest if it is to sustain the constitutional validity of the statute.

Pfost, 713 P.2d at 503.

The majority object to our grammatical interpretation in Pfost of Art. II, Sec. 16, as "flawed." Perhaps the majority have rules of grammar of which this writer is unaware, but we will leave it to the teachers of English that the clause "this full legal redress" refers in Art. II, Sec. 16 to the "speedy remedy afforded for every injury of a person,

property, or character." Grammatically, we insist that "speedy remedy" comprehended "full legal redress."

Speaking in the vein of grammatical construction, the majority ask us to construe the term "full legal redress" in the second sentence of Art. II, Sec. 16 as applying only to injured workmen who have claims against third parties for their injuries. The majority contend that the purpose of the inclusion of the second sentence was only to protect injured workmen and had no effect on the remainder of Art. II, Sec. 16. In this sense, the majority grammatically misconstrue the article. Under its plain language the right of "full legal redress" is not given only to Workers' Compensation claimants. Rather, the right of "full legal redress" is emphatically granted to Workers' Compensation claimants too. The framers intended to make certain that included in Art. II, Sec. 16 was a specific provision which also extended the speedy remedy comprehending full legal redress to Workers' Compensation claimants who might have separate causes of action against third parties, not their employers or fellow employees.

Ashcraft v. The Montana Power Company (1971), 156 Mont. 368, 480 P.2d 812 was the reason for the insertion by the framers of the second sentence in Art. II, Sec. 16, to make certain that Workers' Compensation claimants had the right of full legal redress, too. Ashcraft was a laborer working for a construction company which as an independent contractor was performing work on the job for the general employer, Montana Power Company. Ashcraft was injured through the alleged negligence of the Montana Power Company. He recovered Workers' Compensation benefits through his employer, and sought to sue Montana Power Company as a third party tortfeasor. This Court held that Ashcraft had no cause of action for his injuries against the third party tortfeasor,

Montana Power Company. Ashcraft and several cases of its progeny following, were at the forefront when Art. II, Sec. 16 was considered by the constitutional framers in 1972. The second sentence of Art. II, Sec. 16 was inserted specifically to overrule Ashcraft.

When the provisions of Art. II, Sec. 16 came before the Constitutional Convention for eventual adoption, Delegate Habedank, as indicated in the majority opinion, made a motion to strike the second sentence of the section upon the grounds that the sentence was merely legislative, and its subject was better left to the legislature. Delegate Habedank's amendment to delete the second sentence was defeated in the convention, but before the amendment was submitted to a vote, Delegate Habedank made a comment that is interesting in light of this case:

> DELEGATE HABEDANK: Yes, Mr. President [Chairman] you have had the matter very fairly presented to you by Mr. Dahood. As I told you in the first place, I do not particularly oppose this particular amendment, but I have been told that we lawyers are writing the Constitution, trying to slip matters into this Constitution for our own personal gain. You have had the pro of the con given to you. This is something that can't be corrected by the legislature. You have it in your power to be the supreme Legislature, as the committee has requested you to do. I leave it to you, but I do think that when you do it, you should do it knowing what you do and not accuse the lawyers of pulling the wool over your eyes. (Emphasis supplied.)

Verbatim Transcript, page 1758.

Even more interesting in connection with the Constitutional Convention is that the author of the majority opinion here, a respected member of the Constitutional Convention, stood and opposed Delegate Habedank's motion to delete the second sentence of Art. II, Sec. 16. He stated:

DELEGATE McDONOUGH: Mr. Chairman, I also support the committee's proposal. In Eastern Montana there's a lot of accidents in the oil field, and practically all the work is subcontracted out or contracted out, and we never dreamed--and Mr. Habedank, I am sure, admits himself he never dreamed, because he's defended these law suits--that the Supreme Court would rule in this manner. And I support the committee proposal because it just--it was a very bad law and it should be restored.

Verbatim Transcript, pages 1757, 1758.

There is an inconsistency between the statements of Delegate McDonough in support of Art. II, Sec. 16, and the his statements as the author of the majority opinion as expressed today. If, as he now espouses, Art. II, Sec. 16 gives only a right of access to the courts, but not to a full legal redress, the legislature could make the second sentence of Art. II, Sec. 16, meaningless by simply abolishing the remedies available to third party plaintiffs as they have abolished the tort remedies of the employees in this case. Such a view was unexpressed by any delegate to the Convention. In the light of his opinion today, the commendable efforts of Delegate McDonough to support Art. II, Sec. 16 were not worth the candle. The injured workman now has no more guaranty of a legislature allowing full legal redress than the merest employee relying on implied covenants.

The fundamental right to remedy was expressed to the Constitutional Convention by the chairman of the Bill of Rights Committee, supporting Art. II, Sec. 18 (governmental immunity) when he said:

We submit it's an <u>inalienable</u> right to have remedy when someone injures you through negligence and through wrongdoing, regardless of whether he has the status of a governmental servant or not. (Emphasis added.)

- 57 -

(See Noll and Kenneady v. Bozeman (1975), 166 Mont. 504, 507, 534 P.2d 880, 882). The Jeffersonian word "inalienable" means incapable of being surrendered or transferred. [Webster's New Collegiate Dictionary (1981)].

Now let us state exactly what Corrigan, White, and Pfost stood for. Corrigan established that when a cause of action is grounded on statute the right of a plaintiff to a full legal redress under that statute was fundamental. White and Pfost established that when a statute discriminated invidiously between injured plaintiffs, the courts under Art. II, Sec. 16 would apply exacting scrutiny to determine the necessity, if any, for the discrimination. Those results were commanded by the language of Art. II, Sec. 16.

A major premise of the majority opinion is that Art. II, Sec. 16 is addressed to the courts, and because the section is not addressed to the legislature, the legislature is free to act without restraint except for a minimal rational test. That concept ignores the last sentence of Art. II, Sec. 16, which tells the courts that "right and justice shall be administered without denial." The courts must consider first the right and then justice, and neither must be denied.

A full legal remedy, state the majority, is not a fundamental right; and so bring themselves to deny the essence of a fundamental right. The right of a citizen to claim justice from his state, is, we should agree, a fundamental right; else the right of petition for redress from grievances is meaningless. State protection of citizens from injustice, a fortiori, is also a fundamental right; else the right of petition is toothless.

A legal remedy that delivers only 25% justice automatically also delivers 75% injustice. Assuming a wrong-doing employer, a legal remedy that delivers to the long-term employee only four working years of justice

delivers also the balance of a working lifetime of injustice. For justice is not divisible. Either the result is just or it is unjust, just as a single fact is true or else it is untrue. There is no middle to justice, for injustice takes up where partial justice ends. In defining justice, we do not mess with Mr. In-Between. As surely as there are fundamental rights, there are surely no fundamental half-rights. The right of access to courts is only part of the fundamental right; the right to a full legal remedy completes the part to make a whole. The two, access to the courts and full redress, indivisibly make one fundamental right, and together they are the essence of justice. They must coexist to complete the fundamental right to justice.

The least plausible argument of the majority in this case is that the legislature has the power to limit remedies, and that this Court may not interfere if the legislature so acts. If this were true in all cases, the public in this state would have no protection from free-wheeling legislatures. Fortunately, if the Court does its job, our state constitutional system is designed to contain legislative action within constitutional limits. That design requires the state courts to rein in a rampant legislature. Especially must an appellate court (in Montana the only appellate court is this Court) be watchful to safeguard the rights of the public in state constitutional disputes.

Our appellate jurisdiction has a two-fold purpose: First, we assure state litigants that the decision makers at the first level, the district courts, will make correct decisions, not in isolation, but with the connected support of the state legal system. The review for correctness reinforces the dignity and acceptability of the trial court's decisions, and controls any adverse effects of shortcomings at the first level. The second purpose of this

appellate court is equally important. Our institutional review of the workings of trial courts serves to announce, clarify and harmonize the rules of decision and the application of laws in the state legal system. Necessarily, institutional review is both creative and political; to say that legislatures, and not courts, make law ignores the facts of appellate life.

The final arbiter of what the state law in Montana shall be is this Court, under Art. II, Sec. 16, not the legislature. We are given that power, to be used judicially. The Justices in the majority do not seem to realize it, but in approving without objection or by inaction the Wrongful Discharge From Employment Act of 1987, they are making law. They have blessed what should be repugnant to a court--a savage curtailment of redress for wrongs, and they excuse their inaction by ceding overall power to the legislature. Though the State Constitution requires courts of justice (not the legislature) to afford a speedy remedy for _every_ injury of person, of property, or of character, the majority have taken a detour from the road to remedy. They have declined to insist on not only a speedy remedy, but on full legal redress for wrongfully discharged employees. They have made law by being passive, and deserve no praise. A toothless court, when abstaining from its duty, is making law and is as great a threat to a just government as an unrestrained legislature.

This is not to say that this Court sits as a super legislature, governing by its discretion the policy, wisdom, and direction of legislative acts. When, however, the legislature acts invidiously to discriminate between persons similarly situated, as will be demonstrated below, Art. II, Sec. 16 imposes a duty upon this Court to make certain that right _and_ justice are not denied.

## III.

Having determined that Meech has no fundamental right to a full legal redress here, the majority sustain the equal protection implications of the Wrongful Discharge From Employment Act by applying the rational test. This leads the majority to the irrational result that it is rational to make the state safe for unscrupulous employers.

The legislature made no findings to accompany the Act, nor does the Act itself articulate its purpose. The statements by the majority as to the purpose of the Act are extrapolated from written statements of proponents submitted to the committees considering the Act, and not the whole legislature.

At its core, the Wrongful Discharge From Employment Act is nothing more than a cap on recoverable damages available to wronged employees. In that sense, the type of law we are looking at here is no different than the types presented to us in White and Pfost, supra.

To begin with, the at-will statute which formerly governed employee relationships in Montana is not really repealed in the Act. The same language as existed in § 39-2-504, MCA, is included in § 2 of the Act. At-will employees still exist in Montana.

We should also put out of the way any argument that the Act discriminates with respect to punitive damages to the extent that they are allowed under the Act. The test of punitive damages in § 5(2) of the Act is the same test faced by any plaintiff claiming punitive damages under § 27-1-221, MCA.

The Wrongful Discharge From Employment Act cannot be sustained as an equal protection under the rational basis test because it discriminates adversely between persons

similarly situated and it discriminates vertically as well as horizontally.

Equal protection permits reasonable classifications only if those similarly situated in relevant respects are treated similarly. An Act is excessively underinclusive if it excludes persons who are similarly situated.

The majority opinion does not begin to state the number of ways in which employees similarly situated are discriminated against under the Wrongful Discharge From Employment Act. Horizontally, the discriminations include at least these:

1. A union worker is not affected by the Act; only non-union workers are covered. Thus a union worker who is discharged for "whistle blowing" has larger rights of recovery than a non-union worker discharged for the same reason.

2. Workers whose discharge is the result of a violation of the Human Rights Act, the Equal Employment Opportunity Act, the Pension Reform Act of 1974 (ERISA), the Pregnancy Disability Act and any number of other state or federal acts are not covered under the Wrongful Discharge From Employment Act. Such employees' full rights of recovery are not taken away under this Act (see for example, Drinkwalter v. Shipton Supply Company, Inc. (1987), ___ Mont. ___, 732 P.2d 1335; Breese v. Steel Mountain Enterprises, Inc. (1986), 220 Mont. 454, 716 P.2d 214; and Strong v. State (1979), 183 Mont. 410, 600 P.2d 191.

3. The Act discriminates against long term employees by severely limiting their damages which might be large in magnitude. See Flanigan v. Prudential Federal Savings and Loan (1986), 221 Mont. 419, 720 P.2d 257.

4. A worker on probation is entirely precluded from any action for wrongful discharge.

In addition, the Act is vertically discriminatory in that it imposes upon wrongfully discharged employees the burden of subsidizing a better business climate for wrongdoing employers.

It is not a legitimate state purpose to protect employers from their unscrupulous acts as against the traditional rights of individuals to earn their livelihood. Our state constitution includes among inalienable rights "pursuing life's basic necessities, enjoying and defending their lives and liberties, acquiring, possessing and protecting property, and seeking their safety, health and happiness in all lawful ways. In enjoying these rights, all persons recognize corresponding responsibilities." Art. II, § 3, 1972 Mont. Const.

Thus, no case can be made on a rational basis to sustain a law the principal purpose of which is to subsidize, protect or enhance the acts of wrongdoers.

Because of its manifest discrimination, because it serves no legitimate state purpose, and because it cannot survive a proper balancing test as between the rights of employers and of individuals to pursue life's basic necessities, the Wrongful Discharge From Employment Act of 1987 violates the Equal Protection Clause of the 1972 Montana Constitution, Art. II, § 4.

As stated in Richardson v. Carnegie Library Restaurant, Inc. (NM 1988), 763 P.2d 1153:

> We commence our examination by repeating that the court of appeals erred in its equal protection analysis of the damage limitation. A legislative classification not only must affect equally all persons within the class to which the legislation applies but, to begin with, the legislature must have a legitimate purpose for creating the class, and a constitutionally permissible reason for treating persons within that class differently from those without. See McLaughlin v. Florida, 379 U.S.

184, 190, 85 S.Ct. 283, 287, 13 L.Ed.2d 222 (1964)
. . .

Id., 763 P.2d at 1164.

## IV.

Generally, when a legislative act is invalid because of a discrimination, the act also violates other provisions of the state constitution. That is true in this case. The majority dismisses without proper discussion the due process implications of the Wrongful Discharge From Employment Act.

It is usually a due process argument that an Act which limits the rights of recovery of injured parties must provide a reasonably adequate substitute, or quid pro quo, as the majority calls it. The majority, having adopted the irrational conclusion that the Wrongful Discharge From Employment Act was valid, is driven to a further irrationality in determining that the substitution of mitigated recovery provided to wronged employees in the Act was adequate. Not unlike Polonious in Hamlet, the majority can find in a cloud a camel's shape, a weasel's, or very like a whale.

In determining the adequacy of the substituted recovery in the Act, the majority confined itself to examination of the mitigated four years of damages as against what might be recovered for loss of wages or fringe benefits. The majority paid no attention in determining adequacy to the elimination of compensatory damages, damages for emotional or mental distress, and damages arising from the breach of the implied covenant of good faith and fair dealing. By so examining, the majority managed to escape the best indication of the inadequacy of the recoverable damages in the Act demonstrated by the cases that have come to this Court. The results in such cases as Flanigan, supra, Strong v. State, supra, and Stark v. The Circle K Corporation (1988), 751 P.2d 162, show

the injury done by the Act to plaintiffs through the elimination of common law tort remedies. The Act simply does not survive an adequacy test when properly admeasured against the former law in Montana.

Other constitutional provisions probably affected by the majority decision but not referred to by the majority opinion and thus not pertinent to this dissent are the right to trial by jury, and the privilege and immunity clauses of the state constitution. Art. II, § 26; Art. II, § 31, 1972 Mont. Const. Oregon looks to Art. I, § 20 of its constitutional Privileges and Immunities Clause rather than to equal protection tests to determine the validity of a statute. There the court inquires into whether the challenged statute affects a "privilege or immunity"--that is, "some advantage" to which a person "would be entitled but for a choice made by government authority." Salem v. Bruner (Ore. 1985), 702 P.2d 70, 74. In a recent case in Washington, Sophie v. Fireboard Corporation (Wash. 1989), 771 P.2d 711, the Supreme Court of that state found, because of the language in Washington's Tort Reform Act, a violation of the state constitutional provision of the right to trial by jury. Arguments with respect to similar clauses in our state constitution could be made in this case, but were not raised in briefs nor decided by the majority. They are therefore open to future discussions.

## V.

If Art. II, § 16 of the Montana Constitution does anything, it imposes upon the judiciary the duty to guard the state constitution. In its decision today, this Court sidesteps that duty and reverses not only the cases mentioned in the majority opinion but a long line of cases in the past 15 years that have established solid boundaries for employers and employees, while adhering to the at-will principle

declared in our statutes. In yielding our duty to the vagaries of the legislature, we have disadvantaged a large portion of the Montana labor market in the guise of a better business climate. The Wrongful Discharge From Employment Act of 1987 is economically and socially regressive. The majority opinion is legally regressive. Because of the unwillingness of the majority to act properly in a constitutional case, regressiveness is the order of the day.

I would hold the Wrongful Discharge From Employment Act of 1987 to be invalid on the basis that under an equal protection test it cannot meet even a rational scrutiny. The only basis for the Act that I can find is that as between business and the workers, the legislature discriminatingly prefers business. That is not a constitutional basis on which to found a statute.

_____
Justice

I concur in the dissent of Mr. Justice John C. Sheehy.

_____
Justice

## CHAPTER NO. 641

AN ACT PROVIDING A PROCEDURE AND REMEDIES FOR WRONGFUL DISCHARGE; AUTHORIZING ARBITRATION AS AN ALTERNATIVE; ELIMINATING COMMON-LAW REMEDIES; REPEALING SECTIONS 39-2-504 AND 39-2-505, MCA; AND PROVIDING AN APPLICABILITY CLAUSE AND AN EFFECTIVE DATE.

Be in enacted by the Legislature of the State of Montana:

Section 1. Short title. [Sections 1 through 9] may be cited as the "Wrongful Discharge From Employment Act". [§ 39-2-901]

Section 2. Purpose. [Sections 1 through 9] set forth certain rights and remedies with respect to wrongful discharge. Except as limited in [sections 1 through 9], employment having no specified term may be terminated at the will of either the employer or the employee on notice to the other for any reason considered sufficient by the terminating party. Except as provided in [section 7], [sections 1 through 9] provide the exclusive remedy for a wrongful discharge from employment. [§ 39-2-902]

Section 3. Definitions. In [sections 1 through 9], the following definitions apply:

(1) "Constructive discharge" means the voluntary termination of employment by an employee because of a situation created by an act or omission of the employer which an objective, reasonable person would find so intolerable that voluntary termination is the only reasonable alternative. Constructive discharge does not mean voluntary termination because of an employer's refusal to promote the employee or improve wages, responsibilities, or other terms and conditions of employment.

(2) "Discharge" includes a constructive discharge as defined in subsection (1) and any other termination of employment, including

resignation, elimination of the job, layoff for lack of work, failure to recall or rehire, and any other cutback in the number of employees for a legitimate business reason.

(3) "Employee" means a person who works for another for hire. The term does not include a person who is an independent contractor.

(4) "Fringe benefits" means the value of any employer-paid vacation leave, sick leave, medical insurance plan, disability insurance plan, life insurance plan, and pension benefit plan in force on the date of the termination.

(5) "Good cause" means reasonable, job-related grounds for dismissal based on a failure to satisfactorily perform job duties, disruption of the employer's operation, or other legitimate business reason.

(6) "Lost wages" means the gross amount of wages that would have been reported to the internal revenue service as gross income on Form W-2 and includes additional compensation deferred at the option of the employee.

(7) "Public policy" means a policy in effect at the time of the discharge concerning the public health, safety, or welfare established by constitutional provision, statute, or administrative rule. [§ 39-2-903(1)-(7), inc.]

Section 4. Elements of wrongful discharge. A discharge is wrongful only if:

(1) it was in retaliation for the employee's refusal to violate public policy or for reporting a violation of public policy;

(2) the discharge was not for good cause and the employee had completed the employer's probationary period of employment; or

(3) the employer violated the express provisions of its own written personnel policy. [§ 39-2-904]

- 68 -

Section 5. Remedies. (1) If an employer has committed a wrongful discharge, the employee may be awarded lost wages and fringe benefits for a period not to exceed 4 years from the date of discharge, together with interest thereon. Interim earnings, including amounts the employee could have earned with reasonable diligence, must be deducted from the amount awarded for lost wages.

(2) The employee may recover punitive damages otherwise allowed by law if it is established by clear and convincing evidence that the employer engaged in actual fraud or actual malice in the discharge of the employee in violation of [§ 4(1)].

(3) There is no right under any legal theory to damages for wrongful discharge under [sections 1 through 9] for pain and suffering, emotional distress, compensatory damages, punitive damages, or any other form of damages, except as provided for in subsections (1) and (2). [§ 39-2-905]

Section 6. Limitation of actions. (1) An action under [sections 1 through 9] must be filed within 1 year after the date of discharge.

(2) If an employer maintains written internal procedures, other than those specified in [section 7], under which an employee may appeal a discharge within the organization structure of the employer, the employee shall first exhaust those procedures prior to filing an action under [sections 1 through 9]. The employee's failure to initiate or exhaust available internal procedures is a defense to an action brought under [sections 1 through 9]. If the employer's internal procedures are not completed within 90 days from the date the employee initiates the internal procedures, the employee may file an action under [sections 1 through 9] for purposes of this subsection the employer's internal procedures are considered exhausted. The limitation period in subsection (1) is tolled until the procedures are exhausted. In no case may the provisions of

the employer's internal procedures extend the limitation period in subsection (1) more than 120 days.

(3) If the employer maintains written internal procedures under which an employee may appeal a discharge within the organizational structure of the employer, the employer shall within 7 days of the date of the discharge notify the discharged employee of the existence of such procedures and shall supply the discharged employee with a copy of them. If the employer fails to comply with this subsection, the discharged employee need not comply with subsection (2) [§ 39-2-911]

Section 7. Exemptions. [Sections 1 through 9 do not apply to a discharge:

(1) that is subject to any other state or federal statute that provides a procedure or remedy for contesting the dispute. Such statutes include those that prohibit discharge for filing complaints, charges, or claims with administrative bodies or that prohibit unlawful discrimination based on race, national origin, sex, age, handicap, creed, religion, political belief, color, marital status, and other similar grounds.

(2) of an employee covered by a written collective bargaining agreement or a written contract of employment for a specific term. [§ 39-2-912]

Section 8. Preemption of common-law remedies. Except as provided in [sections 1 through 9], no claim for discharge may arise from tort or express or implied contract [§ 39-2-913]

Section 9. Arbitration. (1) Under a written agreement of the parties, a dispute that otherwise could be adjudicated under [sections 1 through 9] may be resolved by final and binding arbitration as provided in this section.

(2) An offer to arbitrate must be in writing and contain the following provisions:

(a) A neutral arbitrator must be selected by mutual agreement or, in the absence of agreement, as provided in 27-5-211.

(b) The arbitration must be governed by the Uniform Arbitration Act, Title 27, chapter 5. If there is a conflict between the Uniform Arbitration Act and [sections 1 through 9], [sections 1 through 9] apply.

(c) The arbitrator is bound by [sections 1 through 9].

(3) If a complaint is filed under [sections 1 through 9], the offer to artibrate must be made within 60 days after service of the complaint and must be accepted in writing within 30 days after the date the offer is made.

(4) A party who makes a valid offer to arbitrate that is not accepted by the other party and who prevails in an action under [sections 1 through 9] is entitled as an element of costs to reasonable attorney fees incurred subsequent to the date of the offer.

(5) A discharged employee who makes a valid offer to arbitrate that is accepted by the employer and who prevails

in such arbitration is entitled to have the arbitrator's fee and all costs of arbitration paid by the employer.

(6) If a valid offer to arbitrate is made and accepted, arbitration is the exclusive remedy for the wrongful discharge dispute and there is no right to bring or continue a lawsuit under [sections 1 through 8]. The arbitrator's award is final and binding, subject to review of the arbitrator's decision under the provisions of the Uniform Arbitration Act. [§ 39-2-914]

Section 10. Repealed. Sections 39-2-504 and 39-2-505, MCA, are repealed.

Section 11. Severability. If a part of this act is invalid, all valid parts that are severable from the invalid part remain in effect. If a part of this act is invalid in one or more of its applications, the part remains in effect in all valid applications that are severable from the invalid applications.

Section 12. Applicability. This act applies to claims arising after the effective date of this act.

Section 13. Effective date. This act is effective July 1, 1987.

Approved May 11, 1987.

Mr. Justice John Conway Harrison, dissenting.


While I agree with much that is said by the majority in this opinion, the totality of this opinion in reversing so many cases this Court has previously decided, necessitates my filing this dissent.

I cannot concur with all that has been said in the dissent of Mr. Justice John C. Sheehy, yet I find I must agree with Justice Sheehy regarding Corrigan v. Janey (Mont. 1981), 626 P.2d 838, 38 St.Rep. 545. I feel that it is totally unnecessary to reverse Corrigan which established that when a cause of action is grounded on statute the plaintiff has a fundamental right to full legal redress under that statute.


_____
Justice